UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: ABBOTT LABORATORIES, ET AL. PRETERM INFANT NUTRITION PRODUCTS LIABILITY LITIGATION | MDL No. 3026 |
| | Master Docket No. 22 C 71 |
| This Document Relates to: | |
| *Diggs v. Abbott Laboratories* Case No. 2022 C 5356 | |

### ORDER

Plaintiff Keosha Diggs alleges that her minor child K.B., born prematurely in 2015, developed necrotizing enterocolitis ("NEC") as a result of ingesting cow's milk-based infant formula made by Defendant Abbott Laboratories ("Abbott"). Diggs's case is before the court as part of a multidistrict litigation ("MDL") and has been selected as a bellwether case, set for trial in August 2025. Abbott has moved to exclude the testimony of Diggs's proposed experts Dr. Jakki Mohr and Dr. Darren Scheer [74, 76]. For the reasons explained here, those motions are granted.

### STATEMENT

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that a qualified expert witness may offer an opinion if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. FED. R. EVID. 702. As the Seventh Circuit has put it, when deciding whether to admit expert testimony, district courts must evaluate "(1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). The party seeking to introduce the expert witness testimony bears the burden of demonstrating its admissibility. *Id.* at 782.

**I.    Mohr**

Dr. Jakki Mohr is the Regents Professor Emerita of Marketing at the University of Montana and has taught and studied marketing for over thirty years; she previously served on the faculty at the University of Colorado Boulder and received her Ph.D. in marketing at the University of Wisconsin-Madison. (Mohr Expert Rep. [76-7] ¶¶ 22–23.) Mohr was retained as an expert by Plaintiff "to describe and evaluate the marketing strategies" Abbott engages in with respect to its infant formula, focusing on marketing of formula designed for consumption by premature infants. (*Id.* ¶ 1.) Mohr had several goals for this work. (*Id.* ¶ 46.) Her primary research goal was to understand "the strategies Abbott used in marketing its infant formulas"; a secondary goal was to determine "how those strategies varied depending upon the target markets it pursued (e.g. healthcare professionals vs. general consumers/moms)." (*Id.*) Mohr's other goals were to understand Abbott's "strategic marketing process, including objectives and tactics," and to "see how [Abbott's] documents characterized its performance in the market (e.g., sales and market

share)." (*Id.*) To form opinions on those subjects, Mohr reviewed a large set of Abbott "source documents" provided to her by Plaintiff's counsel; these documents, which include "Abbott's PowerPoint presentations and internal emails on marketing-related topics," were presumably produced by Abbott in discovery. (*Id.* ¶ 47.) As Plaintiff puts it, Mohr "extrapolate[d] Abbott's overall marketing strategies" from those "marketing materials."[1] (Pl. Resp. in Support of Mohr (hereinafter "Resp. ISO Mohr") [90] at 3.)

According to Mohr, Abbott made a point of targeting Neonatal Intensive Care Unit ("NICU") personnel in hospitals with its marketing materials because Abbott recognized that NICU personnel "wielded the most influence within the hospitals in driving contract decisions with formula companies." (*Id.* at 3 (citing Mohr Expert Rep. ¶¶ 8, 218, 257–87, 561.) To further bolster its efforts at securing contracts for the purchase of formula, Abbott would also offer its hospital customers "a sliding scale of pricing, including free product samples, depending upon how much of a hospital's volume Abbott supplied." (*Id.* (citing Mohr Expert Rep. ¶¶ 9, 219, 288–310).) Abbott's strategy, Mohr explained, was to recoup the cost of providing hospitals with those free samples or reduced prices via the "downstream sales" generated by mothers and babies provided with Abbott formula while in the hospital; in service of that goal, Abbott's contracts with hospitals (in at least some cases) required that the hospitals' discharge protocols specifically mention Abbott-branded products. (*Id.* at 4 (citing Mohr Expert Rep. ¶¶ 11, 221).)

As Abbott points out, however, there is no evidence in this case that either Plaintiff or the physicians who treated Plaintiff's child, K.B., relied on Abbott's marketing materials in their decision to use Abbott's infant formula. (Mot. to Exclude Mohr at 3.) Abbott further notes that Mohr confirmed at her deposition that she does not offer an opinion as to whether the marketing strategies described in her report impacted the treatment of any infant in particular, including K.B. (*Id.* at 2 (citing Mohr Dep. [76-6] at 127:3–24).)

Plaintiff urges that Mohr's opinions are nevertheless relevant to Plaintiff's negligence, design-defect, and failure-to-warn claims. (Resp. ISO Mohr at 1.) Specifically, Plaintiff notes Mohr's conclusion that "Abbott's marketing strategy demonstrates that it knew of the relationship between the increased incidence of NEC" and Abbott's infant formula. (*Id.* at 4 (citing Mohr Expert Rep. ¶¶ 559–61).) Plaintiff contends that Mohr's opinion on that point "will help the jury understand how Abbott's marketing strategies influenced its decision not to disclose the known risk of NEC to hospitals," including the hospital where K.B. was treated, and that opinion will be relevant to show "foreseeability of harm, knowledge of the defect, and that Abbott's failure to warn was part of an effort to sell" its infant formula. (*Id.* at 5–6.)

The argument is not a compelling one. First, it is not clear to the court how Mohr could have inferred what Abbott knew or didn't know about the risk of NEC created by its formula either from (1) Abbott's strategy of targeting NICU personnel with its marketing materials, or (2) Abbott's strategy of drawing hospitals into contracts by offering reduced formula prices and then recouping the losses via downstream sales.[2] And indeed, Mohr herself seems to confirm that she reached

---

[1] Abbott objects to the soundness of Mohr's methodology (*see* Mot. to Exclude Mohr at 7–8) but the court need not reach that issue to decide the motion.

[2] It is even less clear how these strategies could "influence" Abbott's alleged decision not to disclose the purportedly known risk of NEC to hospitals, and Plaintiff offers no further explanation on that front. A jury could possibly be persuaded that Abbott had a financial incentive not to disclose the risks of NEC, and that its decision not to disclose those risks influenced Abbott's marketing. (*See* Resp. ISO Mohr at 7 (quoting *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Pracs. & PMF Prods. Liab. Litig.*, No. 3:09-md-2100-DRH, 2011 WL

2

her conclusion about Abbott's knowledge not based on a deduction from those marketing strategies but simply by reading the Abbott "source documents" described above. (*See* Mohr Expert Rep. ¶ 231 ("Abbott's business documents specifically addressed the link between formula and NEC").)

It may be the case, as Plaintiff suggests, that some of the material Mohr reviewed is relevant to what Abbott knew about a link between its formula and NEC at the time that it was supplying formula to the hospital where K.B. was born. (*See* Resp. ISO Mohr at 6–7.) But as Abbott argues, the issue is not whether Abbott's marketing material is relevant to the case but rather whether Mohr's testimony about that material is admissible. (*See* Reply to Mohr [98] at 4). Here, Plaintiff offers no examples of relevant marketing materials that a jury would be unable to interpret without the aid of Mohr's testimony. Because Mohr's opinion would seemingly amount to her "tell[ing] the jury what result to reach" based on the marketing materials in question, her testimony on this topic "invade[s] the province of the jury" and is inadmissible. *See United States v. Jones*, 56 F.4th 455, 491 (7th Cir. 2022) (citation omitted); *see also O'Connor v. Ford Motor Co.*, No. 19 C 5045, 2025 WL 790240, at *7 (N.D. Ill. Mar. 12, 2025) (collecting decisions and observing that district courts typically bar expert opinions or testimony concerning a corporation's state of mind or knowledge because the question "is one for the jury, not for an expert") (citations omitted).

Abbott's motion to exclude Mohr's testimony is granted.

## II. Scheer

Dr. Darren Scheer was retained by Plaintiff to "opine as to the adequacy, or lack thereof, of the premature infant formula labeling manufactured and distributed" by Abbott "in regard to [NEC]." (Scheer Expert Rep. [74-1] ¶ 17.) Scheer received both a master's degree in public health and a Ph.D. in epidemiology and public health from the University of South Florida. (*Id.* ¶ 3.) Since receiving his Ph.D., Scheer has dedicated his career, in part, to (1) guiding companies through the development of food and drug products, including by assessing regulatory compliance, and (2) the practice of "pharmacovigilance"— "the monitoring, evaluation, and prevention of adverse effects associated with the administration of medicines." (*Id.* ¶¶ 6–10); *Pharmacovigilance*, MERRIAM-WEBSTER, https://www.merriam-webster.com/medical/pharmacovigilance (last visited July 10, 2025). For her part, Plaintiff refers to Scheer as a "regulatory expert" whose testimony would be relevant and useful to a jury. (Pl. Resp. in Support of Scheer (hereinafter "Resp. ISO Scheer") [92] at 1.) Specifically, Plaintiff argues, Scheer can explain three issues "of which the lay person does not have knowledge": "(1) why regulations allow[ed] Abbott to change its label to warn of the risk of NEC without final FDA approval, (2) what the label should have warned of, and (3) what a reasonably prudent company should have done in Abbott's shoes to report adverse events." (*Id.* at 5.) Notably, however, Scheer has not opined that Abbott's conduct violated any regulations. (*See* Mot. to Exclude Scheer at 12.)

Abbott challenges the admissibility of Scheer's testimony both on the grounds that Scheer is not qualified to offer these opinions—as he has little if any experience in working with infant formula development and regulations specifically—and that his opinions are unhelpful and

---

6740391, at *10 (S.D. Ill. Dec. 22, 2011)) ("evidence about sales goals is certainly relevant particularly when it may impact decision making regarding labeling").) But if Plaintiff's point is simply that a jury could conclude that a desire to sell more formula motivated Abbott not to disclose the risks of NEC, the court struggles to think of a reason why a jury would need the help of Mohr—or any expert—to understand this.

unreliable. (*Id.* at 1–2.) Because the court agrees that the opinions are unhelpful, it need not consider whether Scheer is qualified to give them, or whether he used a reliable method in developing them.

The court is uncertain why Plaintiff believes Scheer's commentary on what the applicable labeling regulations *allowed*, rather than *required*, would help the jury understand the evidence in this case. Abbott has not argued that regulations prohibited it from addressing the risks of NEC in its labeling without FDA approval. Plaintiff's briefing could possibly be read to argue that the fact that regulations did not *prevent* Scheer's proposed labeling change lends credence to Scheer's opinion that the change would have been "prudent." (*See* Resp. ISO Scheer at 8.) But the mere fact of a plan not being illegal says little about its merits. Without further explanation from Plaintiff, the court sees little relevance in Scheer's testimony on this point.

The court next considers Scheer's opinion as to what warnings should have been included in the label for Abbott's infant formula. At his deposition, Scheer explained that he could testify only to "the essence" of what an alternate label should have imparted, "and not verbatim language"; the essence would be that "human milk has a lower risk [of] developing necrotizing enterocolitis, than formula." (Scheer Dep. [76-2] at 128:17–20.) Abbott argues, in part, that because Scheer could testify only to the gist of what the label should have said, his testimony would be unhelpful to the jury, amounting to no more than an "expert gloss" on a conclusion that the jurors should draw themselves. (Mot. to Exclude Scheer at 8–9 (quoting *United States v. Christian*, 673 F.3d 702, 710 (7th Cir. 2012)).) Plaintiff counters that experts opining on failure-to-warn claims "are not required to draft specific, word-for-word alternative labels." (Resp. ISO Scheer at 5–6 (citing *In re Depakote*, No. 14 C 847-NJR-SCW, 2015 WL 4775868, at *5–6 (S.D. Ill. Feb. 13, 2015)).)

The court agrees that there is no per se rule requiring Scheer to draft a complete alternate label in order for his testimony to be admissible—though as Abbott points out, even the expert in *In re Depakote*, cited by Plaintiff, was "reasonably specific in articulating what language and information should have been included in the label." (Reply to Scheer [101] at 6 (quoting 2015 WL 4775868, at *6).) But that does not resolve Abbott's objection. The question is whether Scheer's testimony on this topic would help the jury understand some aspect of the evidence that might otherwise be beyond its grasp. *See Christian*, 673 F.3d at 710–11 (quoting 29 CHARLES ALAN WRIGHT & VICTOR JAMES GOLD, FED. PRAC. & PROC. § 6264 (1997)) ("[E]xpert testimony does not assist where the jury has no need for an opinion because it easily can be derived from common sense, common experience, the jury's own perceptions, or simple logic.") Plaintiff gestures at the idea that the label warning would "exist within a regulatory framework that is outside the scope of a lay person's knowledge," (Resp. ISO Scheer at 5), but, again, Scheer has not opined that Abbott's labeling violated any particular regulation or that the regulatory framework in question otherwise influenced his recommendation. As the court understands, Plaintiff will attempt at trial to show (1) what the risk of ingesting Abbott's formula was as compared to human milk, and (2) that, had he been aware of the extent of that risk, K.B.'s treating physician would not have fed him the formula. (*See id.* at 7–8.) Assuming such evidence exists and is admissible, Plaintiff has failed to explain why a jury could not understand a relatively simple idea—that the formula's label should have warned of the risk—without the aid of Scheer's opinion. Scheer's testimony as to what Abbott's label should have said is inadmissible.

Finally, the court turns to Scheer's opinion that a reasonably prudent company in Abbott's position would have voluntarily transmitted to the FDA a number of reports Abbott received purportedly linking occurrences of NEC to the ingestion of Abbott's formula. Abbott argues, in part, that Scheer's opinion on this topic must be excluded because Scheer did not opine that the

4

additional reporting he believes was appropriate would have "changed any action by the FDA" or "led FDA to require a labeling change." (Mot. to Exclude Scheer at 12–13; *see also* Reply to Scheer at 10 (arguing that Scheer's opinions "amount to little more than speculation" untethered from "what would have made a difference in [K.B.'s] treatment.")) The court further observes that Scheer offers no opinion as to when Abbott had enough information to justify such reporting, or whether such reporting could have occurred in time to have changed the course of K.B.'s treatment in 2015. To be clear, the fact that Scheer could not say that the voluntary reporting he recommended would have affected the FDA's actions or otherwise made a difference in K.B.'s case is not fatal in and of itself. That testimony could plausibly be provided by a different witness. But without *some* evidence that this reporting would have made a difference in K.B.'s case, Scheer's opinion that Abbott's failure to engage in that reporting was imprudent is not relevant, and thus unhelpful to the jury. In its brief opposing Scheer's exclusion, Plaintiff references no such evidence, and the court's review of Plaintiff's brief in opposition to summary judgment ([88]) has revealed none, either.

      Abbott's motion to exclude Scheer's testimony is granted.

                                      ENTER:

Dated: July 24, 2025

                                      REBECCA R. PALLMEYER
                                      United States District Judge