**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: ABBOTT LABORATORIES, ET AL., PRETERM INFANT NUTRITION PRODUCTS LIABILITY LITIGATION | MDL NO. 3026 <br><br> Master Docket No. 22 C 00071 |
| This Document Relates to: <br><br> *Diggs v. Abbott Laboratories* <br> Case No. 22 C 05356 | Hon. Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiff Keosha Diggs gave birth to her son, K.B., on February 7, 2015. At birth, K.B. was moderately premature (32 weeks gestational age) with a low birth weight (2,095 grams) and was immediately admitted to the NICU. Two days after birth, his physicians began feeding him with a cow's-milk-based infant formula ("CMBF") developed by Defendant Abbott Laboratories ("Abbott"). After a week of being fed CMBF, K.B. presented signs of necrotizing enterocolitis ("NEC"), a devastating illness affecting preterm infants, and required surgery removing a section of his intestine. Like hundreds of other plaintiffs in this multi-district litigation ("MDL"), Plaintiff alleges that her child's NEC was caused by exposure to Abbott's preterm formula; her complaint [1] raises failure-to-warn and design defect claims under Maryland law. Specifically, she alleges that Abbott was aware of the increased risk of NEC from CMBF but failed to take steps to improve the formula or otherwise warn doctors and parents of the risk. Plaintiff's claims hinge on the opinion of Dr. Logan Spector, an epidemiologist who has opined (for cases across the MDL) that CMBF substantially increases the risk of NEC in preterm infants. Abbott now moves to exclude Dr. Spector [71], asserting that his conclusions do not apply to preterm infants born at K.B.'s gestational age and weight. Abbott further moves for summary judgment [72], noting that Plaintiff cannot prove that Abbott's formula caused K.B.'s NEC without Dr. Spector's testimony.[1] Because

---

[1] Abbott's motion raises various other grounds for summary judgment, including arguments that Plaintiff's design defect claims are barred by Comment k of the Restatement

the court agrees that Dr. Spector has not provided sufficient testimony to fit his opinions to this case, and that his testimony is indispensable to Plaintiff's theory of causation, Abbott's motions are granted.

## BACKGROUND

I.  **Factual Background**[2]

K.B. was born on February 7, 2015, at University of Maryland Medical Center in Baltimore, Maryland. (Abbott Local Rule 56.1(a)(2) Statement of Facts (hereinafter "Abbott SOF") ¶¶ 7, 31.) He was born at 32 weeks gestational age and weighed 2,095 grams—what is considered moderately premature and low birthweight. (*Id*. ¶ 7.) Due to several circumstances of his birth, including his prematurity, low birthweight, and suspected sepsis, K.B. was immediately admitted to the NICU and received a seven-day course of antibiotics. (*Id*. ¶ 9.) While his nutrition was initially provided parenterally (i.e. intravenous), K.B.'s doctors ordered that he be placed on enteral feedings beginning on February 9, 2015. (*Id*. ¶ 11.) The parties agree that K.B.'s doctors ordered his feedings to be comprised of his mother's breastmilk when available, and Similac Special Care 20 (Abbott's CMBF designed for preterm infants) if mother's milk was not available (*id*.),[3] but Plaintiff disputes whether K.B.'s treaters followed this plan. (*See* Pl.'s Resp. to Abbott

---

(Second) of Torts, that Plaintiff cannot meet the risk utility test under Maryland law, and that Plaintiff's claims seeking damages in a personal capacity are barred by the statute of limitations. For the purposes of this opinion, however, the court focuses only on issues relating to causation.

[2] In providing this background, the court presumes familiarity with its prior orders in this MDL. Of particular importance is its order regarding Plaintiff's general causation experts Dr. Logan Spector and Dr. Jennifer Sucre, which provides an account of Plaintiff's theories of how cow's-milk-based formulas cause NEC in preterm infants. *See generally In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*, No. 22 C 00071, 2025 WL 1283927 (N.D. Ill. May 2, 2025) (hereinafter "General Causation Order").

[3] Plaintiff does not appear to dispute Abbott's statement that the plan for K.B.'s nutrition (putting aside the question of whether it was followed) was for him to be fed breastmilk if available, and formula if breastmilk was not available. K.B.'s medical records state only that he was to be fed "BM/SC20 5ml"—without specific reference to a preference for breastmilk over formula ("SC20" referring to Similac Special Care 20). (*See* Medical Records [75-11] at 2.) K.B.'s physician (who signed the order for "BM/SC20"), Dr. Elias Abebe, explains in his deposition that

SOF [87] ¶ 11.) Beginning on February 9, K.B. was given mixed feedings of formula and mother's milk,[4] with the volume gradually increasing as he gained weight and showed no signs of feeding intolerance. (Abbott SOF ¶¶ 12–14.) By February 16, 2015, K.B. weighed 2310 grams and had reached nearly full-volume feedings, despite receiving almost entirely formula—indeed, between February 9 and 16, CMBF made up 90% of K.B.'s feedings by volume. (*Id*. ¶ 14.)

At 3:00 a.m. on February 17, 2025, K.B. began showing the first signs of NEC, including increased abdominal girth and agitation. (*Id*. ¶ 15; Pl.'s Resp. to Abbott SOF ¶ 15.) X-Ray imaging of his abdomen on that day revealed gaseous distension, pneumatosis, and linear branching lucencies of the liver, reflecting portal venous gas—symptoms confirming a diagnosis of NEC. (*Id*.) On February 18, K.B. was rushed to emergency surgery to remove a 21-cm long portion of necrotic jejunum (small intestine). (*Id*.) It was the first of eight surgeries between February 18 and July 6, 2015, when K.H. was finally discharged from the hospital. (Pl.'s Resp. to Abbott SOF ¶ 16.) In sum, due to NEC, surgeons removed 33.5 cm of K.B.'s small intestine and most of his large intestine. (*Id*.) The parties dispute the extent to which K.B., now in the fourth grade, still suffers from the effects of these surgeries, but Plaintiff has presented evidence that her son suffers from short gut syndrome (impairment to digestion and absorption resulting from loss of intestinal mass) as a result of the surgeries. (*See* Pl.'s 56.1(b)(3) Statement of Additional Facts (hereinafter "PSOAF") [86] ¶ 20; Abbott Resp. to PSOAF [97] ¶ 20.)

Plaintiff claims that K.B.'s exposure to Similac Special Care in the days following birth caused him to develop NEC, leading to his extensive surgeries. K.B.'s medical records

---

the "BM/SC20" notation represented prioritizing breastmilk over formula, and that K.B. was to be fed formula only if breastmilk was not available. (Abebe Dep. [86-21] at 59:15–60:14.)

    [4] Dr. Elizabeth Flanigan, Plaintiff's specific causation expert, has provided a summary of the composition of each of K.B.'s feedings between February 9 and February 16, 2015; it shows that K.B.'s first seven enteral feedings on February 9 were exclusively composed of formula. (*See* Flanigan Rep. [75-3] at 6.) He was given a mix of formula and mother's milk beginning on February 10, 2015, but, on different days, the ratio of formula to mother's milk varied. (*See id*. at 6–7.)

demonstrate that in the week that K.B. was receiving enteral feeding prior to developing NEC, about 10% of his nutrition (by volume) was from his mother's breastmilk, the other 90% coming from Abbott's formula. (Abbott SOF ¶ 14.) Indeed, K.B.'s feedings on February 14, 15, and 16 (a total of 22 feedings) prior to developing NEC were comprised entirely of formula. (*See* Flanigan Rep. at 6–7.) Why Plaintiff's own milk was not used is unclear in the record and a matter of dispute between the parties. Plaintiff maintains that she was expressing at least 8 ounces (approximately 30 mL) of milk each day following her discharge from the NICU on February 9, 2015. (*See* Pl.'s Mem. [88] at 16; Diggs Dep. [86-13] at 222:4–18.) She further asserts that she continued pumping until nurses informed her that K.B. was no longer eating (due to the NEC diagnosis) and that "they had enough of [Plaintiff's] milk frozen." (Diggs Decl. [86-27] ¶ 2.) Across the nine days between Plaintiff's discharge and K.B.'s NEC diagnosis, therefore, Plaintiff claims to have delivered 72 ounces, or 2,129 mL, of milk to K.B.'s NICU—sufficient to replace the total volume of formula that K.B. was fed in that period. (Pl.'s Mem. at 16.) She does not explain what happened to the milk she provided, other than her understanding that it was placed in a freezer, nor does she appear to know why formula was used in its place despite K.B.'s physicians and nurses informing her that he would be fed only her breastmilk. (*See* Diggs Dep. at 240:15–18.)

## II.     Dr. Spector's Report

Dr. Logan Spector is a Professor and Director of the Division of Epidemiology and Clinical Research in the Department of Pediatrics at the University of Minnesota Medical School. (*See* Spector Rep. [71-2] at 3.) His report finds that, using a meta-analysis of randomized control trials (RCTs), predominantly CMBF diets increase the risk of NEC by 60% when compared to human milk diets. (*See id*. at 22.) He further opines that the association between NEC and CMBF is causal, applying the Bradford Hill factors for determining causality. (*See id*. at 26–27.) The court's General Causation Order provides a full description of how Dr. Spector arrives at these conclusions, and the reasons that the court found those methods to be reliable under Federal Rule of Evidence 702. Dr. Spector's testimony is central to Plaintiff's theories of causation; his

epidemiological opinion serves as the basis for the opinions of Plaintiff's other general causation expert, Dr. Jennifer Sucre, as well as Plaintiff's specific causation expert, Dr. Elizabeth Flanigan.

Importantly, Dr. Spector's report discusses the risk of NEC as applied to all preterm infants and does not touch on the applicability of his opinion to infants within specific brackets of gestational age and birthweight. During Dr. Spector's deposition, however, Abbott teased out limitations of his analysis when applied to infants fitting K.B.'s gestational age and birthweight:

> Q: So is it fair to say that none of the studies in your analysis that would have included an infant that was born both above 32 weeks gestations and over 2,000 grams, none of those studies showed a statistically significant difference between the human milk and bovine group?
> . . .
> A: Studies that allowed those groups of infants into the study, correct, it does not seem that there was any significant difference in NEC rates.
>
> Q: So is it possible for that subcategory of infants, those that are both above 32 weeks and above 2,000 grams, that there is no association between necrotizing enterocolitis and formula in that cohort?
> …
> A: I don't have any data that really addresses that.

(Spector Dep. [71-1] at 345:1–24 (objections excluded).) Indeed, a full accounting of the studies Dr. Spector reviewed shows that of the 29 studies Dr. Spector included in his original or amended reports (including randomized controlled trials and observational studies), 24 had inclusion criteria that would have excluded an infant of K.B.'s gestational age and birthweight from the study. (*See* Abbott Ex. 5 [71-5] at 2–3.) Of the five studies that could have included infants like K.B., only two (Adhisivam 2019 and Costa 2018) were RCTs and neither found a positive association between CMBF and NEC.[5] (*Id.*) The remaining three studies—Kamitsuka 2000 (cohort study), Le 2017 (case-control study), and Liu 2023 (case-control study)—reported some association between

---

[5] Per Dr. Spector's own description, Adhisivam 2019 found a .33 relative risk of NEC from CMBF (-66% risk), and Costa 2018 found no relative risk of NEC because there were no incidences of NEC in either the human-milk-fed or CMBF-fed groups of the study. (*See* Spector Am. Rep. [71-4] at 10, 12 (providing risks observed in each study in tables).)

5

NEC rates and CMBF exposure,[6] but both the study authors and Dr. Spector concluded that the observed associations were not statistically significant. (*See* Abbott Spector Reply [100] at 3–4 (quoting studies); Spector Dep. at 343:19–344:23.)

In his deposition, Dr. Spector suggests that an "extrapolation" can be done to apply his conclusions to infants above 2,000 grams and 32 weeks gestational age, but admits that he performed no such analysis himself. (Spector Dep. at 395:2–11.)

### III. Procedural History

Plaintiff filed her complaint in the District Court of Maryland on September 14, 2022. (Compl. [1].) The complaint seeks relief for Plaintiff individually and on behalf of K.B. under Maryland law on five counts: strict liability design defect, negligent design defect, strict liability failure-to-warn, negligent misrepresentation, and punitive damages. (*See generally id*. at 24–36.) On September 30, 2022, the case was transferred to this court as part of MDL 3026 (Transfer Order [12]), and the case was selected as one of four bellwether trials on October 25, 2023. (Order [416] in No. 22 C 71.) Trial was set for August 11, 2025.

In nearly two years since Ms. Diggs' case was chosen as a bellwether in this MDL, Plaintiff has developed significant expert testimony in support of her theories of causation. In addition to Dr. Spector and Dr. Sucre—whose reports relating to general causation were developed in service of all claims in the MDL—Plaintiff has also obtained the testimony of Dr. Flanigan, a practicing neonatologist, who performed a differential diagnosis and opined that Abbott's formula was the specific cause of K.B.'s injuries. (*See generally* Flanigan Rep.) She also procured the

---

[6] Dr. Spector's report describes the results of these non-RCT studies: Kamitsuka 2000 reported a 2.50 risk ratio (+150% risk of NEC from CMBF), Le 2017 reported a 1.67 odds ratio (+67% risk of NEC from CMBF), and Liu 2023 reported a 1.75 odds ratio (+75% risk of NEC from CMBF). (Spector Rep. at 18, 20.) But, notably, these risks fall far short of the relative risks Dr. Spector found in his meta-analysis of all eligible cohort and case control studies. Kamitsuka 2000's (a cohort study) +150% risk falls short of the +226% risk Dr. Spector found from his meta-analysis of all eligible cohort studies. (Spector Rep. at 19.) Le 2017's and Liu 2023's (case control studies) observed risks fall below Dr. Spector's finding of +135% risk from all eligible case control studies. (*Id*. at 20.) As noted, Dr. Spector himself concluded that these observed associations were not statistically significant.

reports of Dr. Darren Scheer, an epidemiologist and pharmaceutical marketing consultant, and Dr. Jakki Mohr, a professor emerita of marketing, who opine about Abbott's labeling and marketing of its formula products. Prior to this opinion, the court has issued opinions denying Defendants' motion to exclude Dr. Spector and Dr. Sucre in the wider MDL (*see* General Causation Order) and granting Abbott's motions to exclude Dr. Scheer's and Dr. Mohr's testimony (*see* Order [105]).

On June 2, 2025, Abbott filed motions to exclude Dr. Spector's testimony from this case [71] and for summary judgment [72]. In both submissions, Abbott highlighted the limitations of Dr. Spector's conclusions with respect to infants born after 32 weeks gestational age and weighing more than 2,000 grams at birth. The court reached out to the parties, seeking more information about the "extrapolation" Dr. Spector appeared to admit was required to apply his opinions to infants like K.B. (*See* Minute Order [107].) Both parties submitted letters in response to the court's order. (*See* Pl.'s Ltr. [113]; Abbott Ltr. [112].) Plaintiff's letter maintained that Dr. Spector, as a general causation expert, was not required to apply his opinions to K.B.'s specific birthweight and gestational age characteristics but acknowledged that no "extrapolation" of his opinion was available in the record. (Pl.'s Ltr. at 1–2.) While Plaintiff argued that such an extrapolation would be possible (either by Dr. Spector or a different expert), she agreed with Abbott that no such extrapolation was possible prior to the August 11 trial date. And she conceded that if the court were to find such an extrapolation necessary for the admission of Dr. Spector's testimony, summary judgment in Abbott's favor would be appropriate. (*Id*. at 2.)

## **LEGAL STANDARDS**

This opinion resolves Abbott's motion to exclude Dr. Spector under Federal Rule of Evidence 702 and *Daubert*, as well as its motion for summary judgment under Federal Rule of Civil Procedure 56.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It states:

7

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court recognized that Rule 702 creates a "gatekeeping role for the judge" by "assign[ing] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. In the court's prior General Causation Order, the court determined that Dr. Spector's report rested on a reliable foundation; Abbott's case-specific challenge to Dr. Spector relates to whether his opinion "is relevant to the task at hand," or "fit."

Summary judgment is appropriate if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court's jurisdiction over this action is based on diversity under 28 U.S.C. § 1332, and the parties agree that Maryland law controls Plaintiff's substantive state law claims.

## **DISCUSSION**

"[T]he *Daubert* inquiry requires that the district court determine whether the testimony would assist the trier of fact in understanding the evidence." *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir. 1995). This is not a question of whether Dr. Spector's conclusions are reliable, but of whether his testimony "fit[s]" the facts of the case such that there

is a "valid scientific connection to the pertinent inquiry." *Daubert*, 509 U.S. at 591–92. Abbott's argument that Dr. Spector's opinions do not fit K.B.'s case is straightforward: Dr. Spector relies exclusively on studies that either exclude infants like K.B. from the study population or, by his admission, find no association between CMBF and NEC. Plaintiff, for her part, does not dispute that the vast majority of the studies cited in Dr. Spector's report did not include infants like K.B., nor does she have a different interpretation of the studies that did include such infants (Adhisivam 2019, Costa 2018, Kamitsuka 2000, Le 2017, and Liu 2023) but find no risk of NEC from formula. Rather, she provides several reasons why Dr. Spector's opinion should be admitted despite these limitations, none of which are persuasive.

First, Plaintiff argues that because Dr. Spector is a general causation expert, he need not opine as to whether CMBF caused NEC in K.B.'s specific circumstances. (Pl.'s Spector Resp. [91] at 4–5.) But this misses the point. Abbott's argument is not that Dr. Spector has not offered a specific causation opinion, but that Dr. Spector's general causation opinion *does not apply* to infants like K.B..[7] Indeed, Dr. Spector appears to admit that a further step, what he calls an "extrapolation," would be required for his conclusions to be applied to infants weighing 2,000 grams and of 32 weeks gestational age at birth. (Spector Dep. at 395:2–11.) Certainly, Dr. Spector was not required to perform this extrapolation himself in his original report—Plaintiff could have offered a case-specific expert to perform this extrapolation or could have directed Dr. Spector to supplement his report in preparation for testifying in this case. But absent *any* testimony that Dr. Spector's estimation of a 60% increased risk of NEC from CMBF and Bradford

---

[7] At various points in her brief, Plaintiff misunderstands Abbott's challenge to be that Dr. Spector should have found studies that include *only* infants above 32-weeks gestational age and above 2,000 grams birthweight. (*See* Pl.'s Spector Mem. at 7.) The court understands Abbott's challenge, instead, to be that Dr. Spector must rely on at least some studies that *include* infants above 2,000 grams and 32-weeks gestational age (among other infants) for his testimony to be relevant to this case. So long as K.B.'s characteristics are representative of the study populations, there is no reason to think that Dr. Spector's opinions would not apply to K.B. It is when infants like K.B. are systematically excluded from the study populations that the question of fit arises.

9

Hill analysis applies to infants like K.B., Plaintiff lacks the crucial connective tissue between Dr. Spector's testimony and the facts of her case.

Second, Plaintiff incorrectly suggests that the court already resolved the issue of Dr. Spector's "fit" in the General Causation Order, and that Abbott's instant challenge to Dr. Spector's testimony rehashes arguments the court already rejected. (Pl.'s Spector Mem. at 5–6.) Plaintiff is correct that Abbott raised a similar argument regarding "fit" in the motion to exclude Dr. Spector's report from the MDL as a whole; there, Abbott argued that because Dr. Spector admitted in his deposition that he did not have a specific opinion as to the risk of NEC for infants above 1,500 grams at birth, his testimony was inapplicable to the many cases of infants who weighed more than that. (*See* General Causation Order at \*12.) The court rejected that argument, finding that many of the studies included in Dr. Spector's analysis included infants above 1,500 grams, such that his opinion could easily be applied to many infants above that weight threshold. (*Id.*) There are two reasons, however, why that holding does not resolve the issue of fit in this specific case. First, the 2,000-gram and 32-weeks gestational age threshold is a more notable boundary for Dr. Spector's opinions than Abbott's arbitrary 1,500-gram threshold. As noted in the General Causation Order, many of the studies included in Dr. Spector's analysis either included infants who weighed more than 1,500 grams or used gestational age alone as exclusion criteria. (*See generally* Abbott's Ex. 5 (listing inclusion criteria of various studies).) In contrast, almost every study Dr. Spector considered—and *all* studies that supported a finding of association between CMBF and NEC—would have excluded K.B. based on his 2,000-gram birthweight, 32-week gestational age, or both. Second, in Dr. Spector's testimony regarding the 1,500-gram threshold, he admitted only that he did not have a separate opinion for infants in that weight category—he did not testify that his general opinion did not apply to infants above that weight. (*See* Spector Dep. at 283:25–284:3; 338:23–339:8.) In contrast, Abbott's questioning of Dr. Spector regarding infants meeting K.B.'s characteristics revealed that he believes an extrapolation from his data is necessary to make any conclusions about an association, much less causation, between CMBF

10

and NEC. Thus, Abbott has not merely moved the goalposts from 1,500 grams to 2,000 grams, as Plaintiff suggests. (Pl.'s Spector Resp. at 6.) Weight of 2,000 grams combined with 32-weeks gestational age presents a distinct limit to Dr. Spector's general causation opinion that the court has not considered before.

Next, Plaintiff suggests that the studies that include infants like K.B. support application of Dr. Spector's testimony to this case. (*See id.* at 9.) She points to two studies in particular: Liu 2025 and Liu 2023. (*Id.*) Neither reference adequately supports Plaintiff's case. Liu 2025 was a case control study that, while including infants in K.B.'s gestational age range and potentially supporting his conclusions, post-dated Dr. Spector's report and was not considered in his analysis. Liu 2023 was a case control study that was included in Dr. Spector's report and would have included infants like K.B. (*Id.*) But, as noted above, when questioned about the study during his deposition Dr. Spector admitted that it found no association between CMBF and NEC. (Spector Dep. at 344:14–23.) Abbott did not "ignore" this study as Plaintiff suggests, but properly noted that its results do not support the fit of his opinions to this case. (*See* Abbott Spector Mem. at 7.)

Finally, Plaintiff urges that epidemiology is the "study of populations" rather than individuals, and that Dr. Spector's opinion should be accepted as applying to all preterm infants. (Pl.'s Spector Resp. at 10.) It is true that Dr. Spector's opinions have application across a range of infants of different birthweights and gestational ages, and that he describes the scope of his opinion in his report as applying to "preterm infants" generally. (Spector Rep. at 25–26.) But recognizing that epidemiology is the study of populations, the relevant "population" for any epidemiological opinion must be derived from the populations of the underlying studies, not the *ipse dixit* of the expert. While Dr. Spector himself does not discriminate between birthweight and gestational ages in preparing his report, the same cannot be said for the studies that support his opinions. Had there been even one RCT that would have included K.B. in its population and supported an association between CMBF and NEC, this might be a different case. But the stark

11

absence of epidemiological evidence supporting Dr. Spector's opinions when applied to infants like K.B. cannot be ignored.

The court concludes that there is insufficient evidence to tie Dr. Spector's testimony to the facts of Plaintiff's case. Plaintiff sought leave to supplement Dr. Spector's testimony to provide this evidence, but the court concludes that it is neither feasible nor fair to Abbott to allow Plaintiff to supplement Dr. Spector's report at this late juncture.[8] As to feasibility, the court has not been persuaded that the "extrapolation" Dr. Spector described (if possible at all)—not to mention Abbott's rebuttal evidence—could be prepared without significantly delaying trial, complicating the timeline of future bellwether cases as currently scheduled. But even if such a supplement were feasible, it would not be fair to Abbott to allow Plaintiff this attempt to cure the defects in her case at this point in the litigation. Plaintiff has known about the admitted limitations in Dr. Spector's testimony since at least the date of his deposition—December 23, 2024. There was sufficient time for Dr. Spector to amend his report or perform additional meta-analyses between then and now, as he did in response to other issues raised in his deposition. (*See* Spector Am. Rep.) Allowing Plaintiff to further amend or supplement Dr. Spector's report now would also significantly burden Abbott, who will undoubtedly seek to challenge any new causation testimony through further *Daubert* challenges to that testimony or by procuring rebuttal expert testimony of its own. As such, the interests of judicial economy and fairness caution against a further supplementation to Dr. Spector's testimony addressing the concern raised above, and his testimony is excluded.

Without Dr. Spector's testimony, Plaintiff cannot meet her burden of showing causation to survive summary judgment. Given the centrality of Dr. Spector's general causation opinion to Plaintiff's other causation experts, and the absence of necessary epidemiological evidence

---

[8] On July 28, 2025, the court heard arguments from the parties about the possibility of supplementing Dr. Spector's report considering Abbott's challenge. (*See* Hr'g Tr. [109].) While Plaintiff maintained that an extrapolation from Dr. Spector's conclusions was possible, they could not assure that Dr. Spector himself could perform that work or that such work could be completed before the start of trial.

supporting her claims absent Dr. Spector's testimony, Plaintiff herself admits that excluding Dr. Spector likely requires entry of summary judgment in favor of Abbott as well. (*See* Pl.'s Ltr. at 2.) The court agrees, and Abbott's motion for summary judgment is granted.

A final comment: the court's ruling on the fit of Dr. Spector's testimony to the facts of this case is dispositive here. It is worth noting, however, that the court has other concerns about Plaintiff's theory of causation, as well. As Abbott pointed out in its summary judgment briefs, Plaintiff has offered scant evidence that an alternate, sufficient warning of the risks of NEC would have made a difference in K.B.'s treatment in the NICU. (*See* Abbott Summ. J. Mem. [73] at 5–10.) K.B.'s physician, Dr. Abebe, testified that he has long been aware of the lower risk of NEC from mother's milk; he went so far as to say that had Abbott provided a warning that mother's milk results in a 77% reduced risk in NEC (a greater risk difference than even Dr. Spector testifies to), it would only "reinforce what [he] ha[s] always been doing." (Abebe Dep. at 182:18–183:3.) Also troubling is that Plaintiff has only speculative evidence that there was anything to feed K.B. other than formula. Her account that she was producing sufficient breastmilk to meet K.B.'s nutritional needs is contradicted by unrefuted testimony that K.B.'s treatment plan was to be fed exclusively breastmilk when available, yet his nurses and physicians fed him almost exclusively formula. Plaintiff suggests that K.B. could have been fed the donor milk-based formula Prolacta (*see* Pl.'s Summ. J. Mem. [88] at 4–5), but she has identified no evidence that Prolacta was available to K.B.'s NICU, or that it would have been feasible or legal to obtain it.

The court need not resolve these issues here, but the deficiencies are worth noting because they are akin to concerns that resulted in the court's summary judgment order in the *Mar* bellwether. *See In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*, No. 22 C 00071, 2025 WL 1282749, at *9–10 (N.D. Ill. May 2, 2025). There, the court granted summary judgment over the plaintiff's failure-to-warn claims because she had failed to provide evidence of an alternative to formula, even assuming Abbott's product warnings were inadequate. (*Id.*) There, as well, the plaintiff developed a paltry record regarding the availability and feasibility of

13

procuring Prolacta. (*Id*. at *10.) The facts in this case are not on all fours with those in *Mar*; Plaintiff's claims that she was producing sufficient breastmilk and the fact that Prolacta formula was on the market at the time of K.B.'s birth make this a closer case. It is notable, nonetheless, that issues relating to cause-in-fact have recurred in this MDL and may continue to recur in the future.

For now, the court holds only that Plaintiff has failed to establish the fit between Dr. Spector's general causation testimony and the facts of this individual case.

## **CONCLUSION**

Motions to exclude [71] and for summary judgment [72] are granted. The Clerk is directed to enter judgment in favor of Defendant Abbott and against Plaintiff.

ENTER:

'

Dated: August 14, 2025

REBECCA R. PALLMEYER
United States District Judge